**Lee CAIN, Appellant,**

v.

**STATE of Texas, Appellee.**

**No. 3–93–387–CV.**

Court of Appeals of Texas,
Austin.

Aug. 17, 1994.

Jane M.N. Webre, Scott, Douglass & Luton, L.L.P., Austin, for appellant.

Dan Morales, Atty. Gen., Jeffee Martinez–Vargas, Asst. Atty. Gen., Austin, for appellee.

Before POWERS, JONES and KIDD, JJ.

POWERS, Justice.

Following a bench trial, the State recovered a money judgment against Lee Cain, Larry McKay, and Timber Creek Oil Compa-

ny, a corporation. Cain appeals. We will affirm the judgment.

## THE CONTROVERSY

Timber Creek was the operator of certain oil wells that it failed to plug after the Texas Railroad Commission ordered it to do so. *See* Tex.Nat.Res.Code Ann. §§ 89.001–.046 (West 1993). Cain was an officer and director of Timber Creek at all material times.

On December 19, 1988, the Commission authorized the expenditure of State funds to pay the expense of plugging the wells. Timber Creek failed to file its franchise-tax report due March 15, 1989. As a result, its charter was forfeited by the State on June 23, 1989, and never revived. Between July 1989 and December 1989, the Commission paid a total of $49,627.39 to plug the wells. The State sued Timber Creek to recover that sum and related sums in the statutory cause of action authorized in section 89.083 of the Natural Resources Code.

■ In its suit against Timber Creek, the State joined Cain as a defendant on a theory that he was personally liable for the corporate debt of $49,627.39 by reason of section 171.255(a) of the Tax Code. The statute provides as follows:

> If the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each *debt* of the corporation that is *created or incurred* ... *after* the date on which the

report, tax or penalty is due and before the corporate privileges are revived.

Tex.Tax Code Ann. § 171.255(a) (West 1992) (emphasis added). The issue before us is whether the Timber Creek "debt" to the State was "created" before or after March 15, 1989, the date the corporation's franchise-tax report was due.[1] In two points of error, Cain contends the trial court erred because the debt was created before March 15, 1989; and thus, he is not personally liable for the corporate debt under the literal terms of section 171.255(a).

Cain makes two arguments: (1) section 171.255(a) must be "strictly construed" because it is "penal is nature"; and (2) a "debt" is "created" within the meaning of section 171.255(a) when the "event" that "authorized" the "debt" occurs, in this case the Commission order in December 1988 that authorized the expenditure of state funds to plug the wells. Cain cites for these contentions the judicial decisions discussed below.

## DISCUSSION AND HOLDINGS

A predecessor statute also made officers and directors personally liable for "debts" that were "created" after forfeiture of corporate privileges. The court construed and applied the statutory language in *Schwab v. Schlumberger Well Surveying Corporation*, 145 Tex. 379, 198 S.W.2d 79 (1946). There, the corporation accumulated a corporate obligation on open account—a liquidated sum and therefore an obvious "debt" in legal us-

---

1. In legal usage, the word "debt" refers ordinarily to a *liquidated* money obligation that is legally enforceable by the owner; that is to say, the legally enforceable obligation must be for a sum certain in money. *See Seay v. Hall*, 677 S.W.2d 19, 23 (Tex.1984); 26 C.J.S. *Debt* 6 (1956). This is presumptively the meaning intended by the legislature in its use of the word "debt" in § 171.255(a) of the Tax Code, a section within Chapter 171 covering the franchise tax.

The idea that "debt" referred to a liquidated sum was augmented considerably in 1987 when the legislature amended Chapter 171 to add the following definition:

§ 171.109. Surplus
(a) *In this chapter:*

  * * * * * *

(3) "Debt" means any legally enforceable obligation measured in a *certain amount of*

*money* which must be performed or paid within an ascertainable period of time or on demand.

(emphasis added). While section 171.109 is headed "Surplus," this does not mean that the definition of "debt" is limited to the calculation of corporate surplus according to the formula set out subsequently in the section. Subsection (a) declares expressly and literally that the definition applies throughout "this chapter," not "this section." If one is tempted to construe differently the scope of the definition's applicability, then one must give weighty reasons for doing so in the face of the literal language and the presumption that the legislature intends the same words to have the same meaning throughout the statutory scheme. *See Fox v. Burgess*, 157 Tex. 292, 302 S.W.2d 405, 407 (1957); *Hufstedler v. Harral*, 54 S.W.2d 353, 355 (Tex.Civ.App.—Amarillo 1932, writ ref'd). No such reasons suggest themselves.

age. Unable to pay the debt, the corporation executed and delivered to its creditor the corporation's promissory note. Unable to pay the note, the corporation gave a series of six consecutive renewal notes, the last of which was executed and delivered to the creditor after forfeiture. The creditor sued on the last renewal note, contending the officer and directors were personally liable under the statute because the note was given after forfeiture.

The court held against personal liability, reasoning as follows: The statute was "penal in nature" and "must be strictly construed and [not] extended beyond the clear import of [its] *literal* language." *Schwab*, 198 S.W.2d at 81 (emphasis added). The word "created" literally means "to bring into existence." Here, the debt came into existence as a liquidated sum on open account at a time well before forfeiture; the creditor failed to prove that any promissory note was a novation that extinguished the open-account debt. Moreover, the last renewal note was not a "debt" at all because under the law of bills and notes "the renewal merely operates as an extension of time to pay the original indebtedness. The debt ... remains the same; it is in substance and in fact the same indebtedness *evidenced* by a new promise." *Id.* at 82 (emphasis added). The statute imposed personal liability "only for debts contracted after the forfeiture of the right to do business, and has no application to the *renewal* of obligations arising prior thereto." *Id.* at 81 (emphasis added).

In *Curry Auto Leasing, Inc. v. Byrd*, 683 S.W.2d 109 (Tex.App.—Dallas 1984, no writ) the court applied section 171.255(a). The corporation in *Curry* breached its lease contract before forfeiture. Under the terms of the contract, however, any resulting sums owing the non-breaching party were not calculable until after sale of the leased property and the sale did not occur until after forfeiture of corporate privileges. Citing the "strict construction" rule of *Schwab*, the *Curry* court conceded the word "create" meant "to bring into existence something which did not exist." Faced with the fact that no liqui-

dated obligation had come into existence before forfeiture, *Curry* nevertheless held against personal liability on the following basis:

> When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions *relate back* to and are authorized at the time of execution of the contract.

*Curry*, 683 S.W.2d at 112 (emphasis added) (citation omitted).

Other decisions have followed *Curry* in its application of the rule of "strict construction" and the relation-back doctrine. In these decisions also, the corporation breached its contract before forfeiture but damages were not calculable or liquidated until after forfeiture of corporate privileges. *See McKinney v. Anderson*, 734 S.W.2d 173 (Tex.App.—Houston [1st Dist.] 1987, no writ); *River Oaks Shopping Ctr. v. Pagan*, 712 S.W.2d 190 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Rogers v. Adler*, 696 S.W.2d 674 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).[2]

A common feature of *Curry* and the subsequent decisions is they (1) *assume* the word "debt" carries a narrow, restricted meaning of a *liquidated* money obligation that is legally enforceable but (2) apply the relation-back doctrine to hold against personal liability of officers and directors *notwithstanding* that assumption. Unless the courts acted under that assumption, the *relation-back doctrine is meaningless.*

All the relevant decisions after *Schwab* turn on the rule of statutory construction known as the "strict construction" rule coupled with the relation-back doctrine. We believe the rule and the doctrine require more careful consideration than they have received heretofore in this context. They are sophisticated judicial instruments; they have a legal history and a specific meaning. They are not simply the sounds a court makes when it delivers a knockout blow to the party contending for personal liability under section 171.255(a).

**2.** *Curry, Adler, Pagan,* and *McKinney* appear to have been decided before the effective date of the

1987 amendment discussed in footnote one to this opinion.

## The Relation–Back Doctrine

The relation-back doctrine holds that an act done at one time is considered to have been done at an earlier time for the purposes of the case before the court. Like all such fictions, it enables the court to arrive at conclusions that will effectuate justice while maintaining simultaneously the appearance of logical consistency. The doctrine originated in equity but courts now apply it in any number of circumstances when is it necessary to effectuate justice.[3] It has nothing to do, of course, with the common law rule of *Schwab* that a promissory note is not a debt but merely evidence of a debt.

Broadly speaking, the relation-back doctrine may be applied to give effect to the parties' lawful intentions, preserve rights that would otherwise be lost, or afford a remedy when none would otherwise exist. *See Brandon v. Claxton,* 30 S.W.2d 679, 680–81 (Tex.Civ.App.—Dallas 1930), *aff'd,* 121 Tex. 184, 47 S.W.2d 263 (1932). The *Curry* court applied the doctrine for the first such purpose:

> *When parties enter into a contract the law presumes they intend the consequences of its performance. It follows* that performance or implementation of the contractual provisions relate back to and are authorized at the time of execution of the contract.

*Curry,* 683 S.W.2d at 112 (emphasis added) (citation omitted). *Rogers, Pagan,* and *McKinney* followed and relied upon the doctrine in a slightly different way. Presumably these decisions rest on the idea that one who contracts expressly with a corporation in good standing necessarily intends to look to that limited-liability entity for performance, and in justice he should be confined to the consequences of that intention.[4]

Merely to refer to the purposes of the relation-back doctrine demonstrates that it is not justified in Cain's case. The doctrine is not necessary to effectuate Cain's lawful intentions; neither is the doctrine necessary to protect from loss some right that Cain has acquired nor to furnish him a remedy because he would not otherwise have one for a wrong he has suffered. Contrary to his argument, the decisions cited above have not engrafted upon section 171.255(a) an appendage holding that officers and directors are never personally liable whenever it may appear that a post-forfeiture debt has some connection to a pre-forfeiture event, cause, or circumstance.

## The Rule of Strict Construction

*Schwab* adhered to the narrow or strict meaning of the word "create" and operated, moreover, on the assumption that the word "debt" also was similarly restricted to its technical meaning of a liquidated obligation that was legally enforceable against the corporation. The subsequent decisions mentioned previously also operated on that assumed meaning in applying the relation-back doctrine. It is therefore difficult to comprehend Cain's invocation of the strict-construction rule of statutory construction because, under that rule, Timber Creek's "debt" first came into existence after forfeiture and he is

---

**3.** A few examples will suffice. *See* 17A C.J.S. *Contract* § 455, at 574 (1963) (when contracting party elects one alternative permitted by contract, all rights between the parties attach as from the making of the contract); 26 C.J.S. *Deeds* § 94, at 853–54 (1956) (if no other equities intervene, legal effect of deed may relate back to a date earlier than its delivery); 33 C.J.S. *Executors and Administrators* § 151, at 1113 (1942) (issuance of letters testamentary related back to date of deceased's death and validated necessary or proper acts of the representative done in the interim); 84 C.J.S. *Taxation* § 623, at 1244 (1954) (bank's payment of taxpayer's check relates back to the date the check was received by taxing authority).

**4.** In *Dae Won Choe v. Chancellor, Inc.,* 823 S.W.2d 740 (Tex.App.—Dallas 1992, no writ), the court held that services rendered on an open account *after* the corporation failed to file its franchise-tax report on the due date resulted in the directors' personal liability under "the plain and ordinary meaning of the words in section 171.255," even though the corporate franchise had not yet been forfeited.

In *Wilburn v. State,* 824 S.W.2d 755 (Tex. App.—Austin 1992, no writ), this Court held that an unemployment tax was a "debt" that was "created" when the wages were actually paid, meaning of course that the amount thereof was a liquidated sum, and when payment was required for work done before loss of corporate privileges the directors and officers were not personally liable therefor under section 171.255.

therefore personally liable for the debt under section 171.255(a). Cain actually contends for a liberally expanded interpretation of the words "draft" and "create" so that they encompass legal obligations of *all* kinds, rather than liquidated money obligations only. We will nevertheless discuss further the rule of strict construction, assuming Cain has properly invoked the rule.

■ The language and legal effect of a statute may require its "strict" construction, meaning a limited, narrow, or inflexible reading and application of it. This is true generally of two classes of statutes, those that authorize a penalty and those that infringe upon private property or liberty interests. Application of the rule does not, however, follow automatically once the court is able to ascertain that the operative effect of the statute places it within one of the two classes.

The rule rests upon two basic propositions. The first is that of fair notice. When statutory language is susceptible of either an expansive or a restricted meaning, and it imposes a penalty, it may be necessary to adhere to the latter meaning so

> that the party upon whom it is to operate may with reasonable certainty ascertain what the statute requires to be done, and when it must be done; otherwise there would be no opportunity for a person charged with the statutory duty to protect himself by the performance of it according to law.

*Missouri, K. & T. Ry. v. State,* 100 Tex. 420, 100 S.W. 766, 767 (1907); *see also State v. International & G.N. Ry.,* 107 Tex. 349, 179 S.W. 867 (1915); *Houston E. & W. Ry. v. Campbell,* 91 Tex. 551, 45 S.W. 2 (1898). Cain does not suggest that he has been subjected to liability because the terms of section 171.255(a), or some other statute, are written in language that is insufficiently specific in light of the penalty it imposes.

■ In this connection, we might observe that the necessity for a literal, narrow, and inflexible interpretation diminishes considerably when the penal statute supplies procedures for preventing or circumscribing the chances of arbitrary action being taken by government in the name of the statute, what-ever it lacks in specificity. *Carbide Int'l Ltd. v. State,* 695 S.W.2d 653, 659 (Tex.App.—Austin 1985, no writ); *see* 3 Sands, *Sutherland Statutory Construction* § 59.07, at 22 (1974) ("[P]rocedural safeguards may now be conceived to be more suitable than the safeguard of strict construction to protect the interests of individuals in not being subjected to undeserved punishment."). The Tax Code provides such procedural safeguards in sections 171.312 and 171.313, which authorize administrative revival of the corporate shield and privileges on filing of the delinquent report and paying the sums owing the State. Similarly, the Natural Resources Code provides for hearings and judicial review of the Commission's actions in cases like the present. *See* Tex.Nat.Res.Code Ann. §§ 81.-0531–0532, 85.381 (West 1993).

The second proposition underlying the rule of strict construction is that of proportion:

> [T]he more severe the penalty, and the more disastrous the consequences to the person subject to the provisions of the statute, the more rigid will be the construction of its provisions in favor of such a person and against the enforcement of such law.

*Missouri, K & T. Ry.,* 100 S.W. at 767. We may assume the potential penalties under section 171.255(a) are severe.

So far as we are able to find, the word "debt" as used in that statute has never been thought to include an obligation that is unliquidated. Indeed, it is difficult to see how such a meaning could be assigned the word if it is required to be construed strictly, that is to say, narrowly, literally, and technically.

## CONCLUSION

■ Under the strict meaning of the word "debt," no corporate debt came into existence in Cain's case until after forfeiture. Before forfeiture, Timber Creek's obligation existed only in unliquidated form; the obligation did not become liquidated until after forfeiture. Shall we hold that the liquidated obligation relates back to a time before forfeiture, to the date the Commission authorized the expenditure of State funds, for example? No justification is claimed for our doing so and it

is difficult to imagine what that justification might be.

"The statute was meant to prevent wrongful acts of culpable officers of a corporation, and was for the protection of the public and particularly those dealing with the corporation." *Schwab,* 198 S.W.2d at 81. The circumstances of the present case fit squarely within this statutory objective. The corporation was under a statutory duty to plug the wells and the Commission ordered it to do so. Cain was a corporate official responsible for seeing that the corporation performed its duty. He has not argued that he was not culpable in that regard. He has instead argued that the statute, properly construed, simply does not apply in these circumstances. We disagree and therefore overrule Cain's two points of error and affirm the trial-court judgment.

KIDD, Justice, concurring.

I concur in the judgment that the appellant, Lee Cain, is personally liable to the State of Texas for the cost expended by the State to plug certain oil wells owned and operated by Timber Creek Oil Company ("Timber Creek"), of which Cain was an officer and director. I choose to write separately, however, to express my views for affirming the trial court judgment.

## BACKGROUND

The material facts of this summary judgment case are undisputed. Timber Creek was the designated operator of fifty oil wells in the Corsicana Field, Navarro County, Texas. At all material times Cain was an officer and director of Timber Creek. Because the wells had been inactive and unplugged since approximately September of 1984, the Texas Railroad Commission ("the Commission"), on June 8, 1987, filed a request for action to (1) determine whether Timber Creek had violated any statewide rules; (2) impose administrative penalties; and (3) order Timber Creek to plug the wells. *See* Tex.Nat.Res. Code Ann. § 89.041 (West 1993).

On May 12, 1988, the Commission held a public hearing on the wells, and on July 8, 1988, the hearings examiner circulated a proposal for decision. In her proposed decision the examiner recommended that Timber Creek be ordered to plug the wells and pay an administrative penalty.[1] On August 15, 1988, the Commission rendered its final order, which adopted entirely the hearings examiner's proposed decision and ordered Timber Creek to plug the wells. *See* Tex.Nat. Res.Code Ann. § 89.042 (West 1993).

When Timber Creek failed to comply with the Commission's order to plug the wells, the Commission decided to exercise its authority to plug the wells itself. Section 89.043 of the Code provides that if, after a hearing and a Commission order to plug is issued, the wells remain unplugged and are likely to constitute a serious threat of pollution or injury to the public health, the Commission can take action to plug the wells with State funds. Tex. Nat.Res.Code Ann. § 89.043 (West 1993). After determining that the fifty wells in question did pose a threat of pollution and a danger to public health, on December 19, 1988 the Commission rendered its order entitled "Authorization to Plug With State Funds," which provided:

> authorization [is] granted to expend such funds in the manner, for the purposes and subject to the prescriptions provided by law and to do such things as are necessary and proper to effectuate the proper plugging of the wells above-listed including authorization to appoint agents and to enter onto land....

After a bidding process, the State of Texas authorized an independent contractor to plug the fifty wells. The wells were actually plugged between May 25, 1989 and September 23, 1989.

In the interim, Timber Creek failed to pay its franchise taxes that were due on March 15, 1989. As a result, on June 23, 1989, the State of Texas forfeited Timber Creek's right to do business. Pursuant to Section 171.-255(a) of the Texas Tax Code, Cain, as an officer and director of Timber Creek, became

---

1. In the present action, the State does not seek to hold Cain individually liable for the administra-

tive penalty assessed against the company.

liable for each debt of the corporation "created or incurred" after March 15, 1989. *See* Tex.Tax Code Ann. § 171.255(a) (West 1993) (hereinafter "the Tax Code").

The State of Texas sought to impose liability individually on Cain utilizing the Tax Code in conjunction with Section 89.083 of the Natural Resources Code, which provides as follows:

> § 89.083. Cause of Action If Commission Plugs
>
> (a) If the commission plugs a well under Sections 89.043 through 89.044 of this code, the State has a cause of action for all reasonable expenses incurred in plugging or replugging the well according to the rules of the commission in effect at the time the well is plugged or replugged.
>
> (b) The cause of action is:
>
> (1) first, against the operator, . . .

Tex.Nat.Res.Code Ann. § 89.083 (West 1993).

Thus, the State filed suit to establish liability against Timber Creek and its officers and directors, one of whom was Cain. The State contended that since Timber Creek failed to file its franchise tax report on March 15, 1989, its officers and directors were liable for the state funds expended to plug the wells. Because the wells were plugged between June and September of 1989, *after* the failure to pay franchise taxes, the State argued that Cain was individually liable.

Cain responded that he should not be held individually liable because, although the wells were not physically plugged until after March 15, 1989, the Commission authorized the expenditure of state funds in December 1988, at a time when Timber Creek's franchise taxes were current. Cain argued that the creation of the debt related back to a date prior to the franchise tax default.

The district court rejected Cain's position and accordingly rendered judgment against Timber Creek and its officers and directors, including Cain, jointly and severally. Only Cain appeals to this Court.

In two points of error, Cain actually articulates a single complaint: the trial court erred in concluding that the State's reimbursement expense cause of action was a *debt* which was *created or incurred* after the failure to pay franchise taxes on March 15, 1989.

## DISCUSSION

This is the third in a series of cases decided upon similar facts in which we conclude that a debt created under the well-plugging provisions of the Texas Natural Resources Code may be enforced against individual officers and directors of a defaulting corporation. *See Jonnet v. State,* 877 S.W.2d 520 (Tex.App.—Austin 1994, no writ h.); *Serna v. State,* 877 S.W.2d 516 (Tex.App.—Austin 1994, no writ h.). In both *Jonnet* and *Serna,* we held that pursuant to the statutory scheme provided for in the Code, the key question was when the statutory liability was created. Since the Commission action in both *Jonnet* and *Serna* post-dated the franchise tax default, we concluded that individual liability under the Tax Code was proper. In the instant case, the statutory scheme under the Natural Resources Code provides that the Commission is empowered to plug wells through the use of state funds. Pursuant to Section 89.083, I would hold that a cause of action for reimbursement of the State is *created* when the well is actually plugged. Therefore, applying this interpretation to the facts of this case, since all fifty of the wells in question were plugged *after* the failure to pay franchise taxes, Cain, as an officer and director of Timber Creek, is personally liable for the reimbursement debt.

Cain cites a series of cases for the proposition that debts arising from the breach of a written instrument or contract relate back to the date of the instrument or contract.[2] Cain contends that we should apply the rationale of these cases and relate back the State's well-plugging expenses to December 1988, the date when the expenditure of state

---

**2.** *See McKinney v. Anderson,* 734 S.W.2d 173 (Tex.App.—Houston [1st Dist.] 1987, no writ); *River Oaks Shopping Ctr. v. Pagan,* 712 S.W.2d 190 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.); *Rogers v. Adler,* 696 S.W.2d 674 (Tex.App.—Dallas 1985, writ ref'd n.r.e.); *Curry Auto Leasing, Inc. v. Byrd,* 683 S.W.2d 109 (Tex. App.—Dallas 1984, no writ).

funds was authorized. Thus, under this argument, Cain contends that since the original Commission authorization occurred *before* the franchise tax forfeiture, no individual liability ought to attach to him.

We rejected this argument in both *Jonnet* and *Serna,* relying on our prior holding in *Wilburn v. State,* 824 S.W.2d 755 (Tex. App.—Austin 1992, no writ). In *Serna,* we limited the "relation back" doctrine to contractual obligations. We specifically declined to apply the "relation back" doctrine to actions that are statutorily required and administratively ordered. *Serna,* 877 S.W.2d at 519–20. Thus, applying the holdings in *Jonnet, Serna,* and *Wilburn,* I concur in the affirmance of the district court judgment.

JONES, Justice, dissenting.

I respectfully dissent, for the reasons set forth in my dissenting opinion in *Jonnet v. State,* 877 S.W.2d 520 (Tex.App.—Austin 1994, writ requested).