United States Court of Appeals
Fifth Circuit

**F I L E D**

November 22, 2005

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

_____

No. 04-11420
_____

In The Matter Of: JAMES ALBERT JAY,

Debtor,

--------------------------------------------------------------

NESCO ACCEPTANCE CORPORATION; NESCO INC; LINC
ACQUISITION ONE LLC,

Appellants,

versus

JAMES ALBERT JAY; ANN C. JAY,

Appellees.

Appeal from the United States District Court
For the Northern District of Texas

Before REAVLEY, HIGGINBOTHAM, and GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Nesco Inc. and Nesco Acceptance Corporation (collectively, "Nesco") appeal the district

court's judgment affirming the bankruptcy court's order voiding a warranty deed between Nesco and

James and Ann Jay ("the Jays") over a .85 acre tract of land. Nesco avers that the bankruptcy court

erred by finding that the property in question was a business homestead.

I

The Jays acquired title to an .85 acre tract sometime in 1984 and have since used the land to operate a service station and convenience store. The Jays also acquired title to a neighboring 1.04 acre plot, which was used only intermittently for business. The Jays have never resided on either parcel of land. In November 1999 the Jays entered into negotiations with Nesco to finance improvements on the .85 acre property. Nesco told the Jays that it would provide financing only if the Jays agreed to convey the property to Nesco. The Jays testified before the bankruptcy court that Nesco agreed to build a new facility that it would then lease back to them. The resulting Retail Store Lease ("Lease") was signed by the parties on December 15, 1999. The Lease provided, inter alia, that the term would begin on April 1, 2000, and run twenty years. The Lease also gave the Jays, as tenants, an option to repurchase both tracts at any time during the lease or upon its termination. The existing facilities were demolished in early January 2000, and on the 13th of that month, the Jays conveyed to Nesco title to the property by warranty deed. At the same time, the Jays conveyed by quitclaim deed the 1.04 acre tract to Saul Pullman, who then executed a warranty deed and conveyed the land to Nesco.[1]

The new facilities were eventually completed, and the Jays opened the new service station. The Jays, however, never made any lease payments to Nesco as required under the terms of the lease. Nesco filed a forcible entry and detainer suit in state court to eject the Jays from the property. The Jays sought bankruptcy protection and removed the case to bankruptcy court.

---

[1]     The Jays contended that Pullman had acquired the tract through a wrongful foreclosure. The transaction was structured in this way to avoid any questions about title.

The bankruptcy court held that the Jays owned a business homestead as defined under the Texas Constitution on the .85 acre tract. The court further held that the sale/leaseback arrangement was a "pretended sale" in violation of the Texas Constitution; that the deed to Nesco was void; that Nesco's mortgage lien on the property was void; and that Nesco possessed an unsecured claim for money Nesco had paid the Jays as an investment in inventory and working capital, which the court considered to be a simple loan.[2] The district court affirmed the bankruptcy court's decision in all respects.

II

Nesco raises three issues on appeal. First, Nesco contends that the bankruptcy and district courts erred in applying the business homestead requirements provided in the Texas Constitution prior to the 1999 amendment. Second, Nesco argues that the courts wrongly concluded that this was a "pretended sale" prohibited by the Texas Constitution. Finally, Nesco contests the courts' determination that Linc was not an innocent lienholder with rights to enforce the lien against the property.

We review the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court. *Carrieri v. Jobs.com Inc.*, 393 F.3d 508, 517 (5th Cir. 2004). A bankruptcy court's findings of fact are reviewed for clear error and its conclusions of law *de novo*. *Id.*

Prior to November 1999, a property owner could establish a business homestead under the Texas Constitution if the property in question was used "as a place to exercise the calling of

---

[2] Subsequent to their transactions with the Jays, Nesco obtained a loan from Bank One in exchange for a lien on the .85 acre property. Bank One sold its interest in the Nesco note to Linc Acquisition One, LLC ("Linc"). Linc is also appealing the bankruptcy court's decision.

business." Tex. Const. of 1876, art. XVI, § 51. Property designated a homestead is granted certain protections, including exemption from forced sale for the payments of debts. This protection also voids all "pretended sales" of the homestead to avoid these constitutional restrictions. Tex. Const. art. XVI, § 50(a), (c). In November 1999, an amendment to the Constitution, approved by Texas voters, provided homestead protection only if the property "shall be used for the purposes of a home, or as both an urban home and a place to exercise a calling or business." Tex. Const. art. XVI, § 51. On January 1, 2000, a provision of the Texas Property Code went into effect that expressly applied the newly amended definition to "all homesteads in this state *whenever created*." Tex. Prop. Code Ann. § 41.002(d) (Vernon 2000) (emphasis added).

Because the business dealings between the Jays and Nesco cross the operative dates for the amendment and the statute, the relevant question for purposes of this appeal is which homestead definition applies. The district court determined that the amendment to the Texas Constitution was passed after the creation of the Jays' homestead and thus did not affect their rights. Furthermore, under the district court's reasoning, the retroactivity of the amendment triggered by the Texas Property Code on January 1, 2000 did not matter in this case because the rights had vested on December 15, when the parties signed the lease agreement. Nesco offers several reasons that the amended definition of a business homestead should apply, thus stripping the .85 acre tract of its homestead protection. Nesco argues that the amendment is expressly retroactive, that the relevant transaction took place after the amendment to the Constitution, and that it was improper for the bankruptcy court to find that the execution of the warranty deed in mid-January related back to the lease date in December.

There is no need to consider the retroactivity of the constitutional amendment or the

application of the statute because we determine that it was improper for the district court to "relate back" the execution of the warranty deed in January 2000, to the signing of the lease agreement in December 1999. It is a well-settled principle of Texas law that a deed takes effect from the date of its delivery. *James H. Tuttle v. Turner, Wilson & Co.*, 28 Tex. 759 (1866). "The presumption that a grantee will accept a deed because it is beneficial to him will never, it is said, be carried so far as to consider him as having actually accepted it." *Id.* Where there has been a contract for sale, however, the deed can be said to "relate back" to the date of the contract, when the rights of the parties were fixed. *Alexander v. Anderson*, 207 S.W. 205, 208 (Tex. 1918); *see also Steed v. Crossland*, 252 S.W.2d 784, 787 (Tex. Civ. App.))Beaumont 1952, writ ref'd) ("If there be no question concerning relation back, it is held that a deed takes effect between the parties when it is delivered to the grantee.").

Those cases concerning deeds which allow relation back, however, refer only to a contract of sale between the parties. *See, e.g.*, *Wilkerson v. Wilkerson*, 992 S.W.2d 719, 722 (Tex. App.))Austin 1999, no pet.) ("When real property is acquired under a contract for deed or installment contract, the inception of title relates back to the time the contract was executed."); *Jenkins v. Chambers*, 9 Tex. 167, 1852 WL 4043 at *23 ("A deed executed in pursuance of a previous contract relates back to the time of the contract and covers all intermediate acts."); *see* 26A C.J.S. Deeds § 166 (discussing the relation-back doctrine and its application in limited circumstances, including antedating a deed, correcting a deed, and executing a deed pursuant to a contract for sale). Relation-back cases that do not deal with deeds similarly use the language of contract: "*When parties enter into a contract the law presumes they intend the consequences of its performance. It follows that performance or implementation of the contractual provisions relate back to and are authorized*

at the time of execution of the contract." *Cain v. State*, 882 S.W.2d 515, 518 (Tex. App .) ) Austin 1994, no writ) (quoting *Curry Auto Leasing Inc. v. Byrd*, 683 S.W.2d 109, 112 (Tex. App.) ) Dallas 1984, no writ).

A lease does not constitute a contract of sale. The Lease between the Jays and Nesco did not trigger any duties for either party until April 1, 2000. The demolition of the buildings on the .85 acre tract did not begin until January 2000, and was not undertaken pursuant to any language in the Lease. The Jays deeded the land to Nesco on January 13, 2000, and it is improper to relate the date of the vesting of the rights back to December 1999. To expand the relation-back doctrine to include not only a contract for sale, but also all written instruments that allude to or reference a future transfer of property, would expand the principle so far as to undermine the clear rule regarding the execution of deeds.[3]

Because the deed was executed in January of 2000, the amended definition of a business homestead is controlling. Since the Jays have never lived on the .85 acre tract, the land does not meet the requirement of a business homestead and is thus not due the special protection granted homesteads by the Texas Constitution. There is no need to reach the additional arguments made by

---

[3] The dissent urges that we should follow the bankruptcy court and relate the date of the sale back to December 1999 because of the existence of an oral or implied contract between the parties predating even the Lease agreement. Contrary to the dissent's assertion, the bankruptcy court did not make sufficient findings to support the existence of a legally binding oral contract between the parties. "[T]he terms of an oral contract must be definite, certain, and clear as to all essential terms." *Farone v. Bag'n Baggage, Ltd.*, 165 S.W.3d 795, 802 (Tex. App.) ) Eastland 2005, no pet.) (citing *Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.) ) Corpus Christi 2004, no pet.). Even if there were a generalized prior agreement) ) as the bankruptcy court assumed must have existed prior to the parties' entering the Lease) ) it would not constitute a definite and clear contract for sale, with specific and determined terms. And to imply a contract in this situation would open all negotiations for the sale of land to the danger that a court could find a prior binding contract, thereby, in effect, negating the clear rules governing the sale of real property. Therefore, we need not reach the further question of whether such an oral or implied contract would trigger the relation-back doctrine.

Nesco, as they are premised on a determination that the .85 acre tract was a homestead under the Texas Constitution.   Because we do not so find, these other arguments need not be addressed.

Accordingly, the district court's decision is REVERSED and REMANDED for proceedings not inconsistent with this opinion.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

## I

I am not persuaded by the majority opinion. With respect, I dissent.

The bankruptcy court, affirmed by the district court, found that the effective date of the deed related back to December 15, 1999, by which time there was a contract for sale. The majority holds that the January 13, 2000 delivery of the deed did not relate back to December 15, persuaded that there was no such contract to sell the property.

The courts below held that a contract for sale existed by December 15, the date the parties signed the Lease. Nesco demolished the existing building and began construction on January 2 or 3 and received the deed on January 13. They concluded, and I agree, that it makes little sense for Nesco to demolish a building on property it had no right to purchase, or for the Jays to deliver a deed to land for which there was no contract for sale, oral or otherwise. And Nesco could not lease property to the Jays that it did not own.

There is more than the strangeness of the events as portrayed by the majority. By the Lease terms, Nesco was the owner and lessor and the Jays were the lessees; that is, there was to be a purchase of the land by Nesco and its lease back to the Jays. No surprise here, since the claim in this case is that the transaction was a "pretended sale" in which the parties structured what was a lien as a sale and leaseback, with the "lease" which set the "rent" and the terms on which the Jays could "buy" back their property embodying the pretended sale. It was not a normal lease. More to the point, to say simply that "[a] lease does not constitute a contract for sale" begs the question of whether this was a lease or a loan - that is the issue in the case.

It is difficult to quarrel with the conclusion of the bankruptcy court that "no doubt" an oral or implied contract for sale was formed.[4] If so, the lower courts did not "expand the relation-back doctrine" to reach a lease. They rather found that there was an agreement for sale. We should affirm the bankruptcy court's well-supported conclusion that the Jays satisfied the widely accepted, if exacting, requirements for showing the existence of an oral or implied contract, giving it discretion to apply the equitable relation back doctrine.[5]

And I would affirm its application of that discretion. Finding there to be "little doubt that Nesco structured its transaction to circumvent Texas homestead laws," the court applied the doctrine for two reasons: 1) to give effect to the parties' intentions, because the parties believed that the .85 acre tract constituted the Jays' business homestead, and 2) to preserve rights that would otherwise be lost, because the Jays lost rights by January 13, 2000, a loss not contemplated in the December

_____

[4]The bankruptcy court also included a useful footnote attempting to explain the delay between the signing of the Lease on December 15, 1999 and the delivery of the deed on January 13, 2000. It noted that a third-party had allegedly foreclosed on the 1.04 acre tract and that both parties had contacted this third-party, who eventually executed his own deed after Nesco paid him off. I agree with the court that, "as is more than likely, the delay in execution of the deed was logistical. Documents had to be prepared, and [the third-party] and others had to be contacted and persuaded to release their liens."

[5]The majority rejects this conclusion because the terms of the contract were allegedly insufficiently definite, thereby creating the danger that all negotiations could be judicially recast as contracts. In fact, the terms here were exact, as they are embodied in the Lease itself. The Jays contracted to sell definite land (the two tracts) for a definite price (the amortization schedule) under definite conditions (the other terms in the Lease). The contract was clear as to all essential terms. The majority ignores the real issue here: whether the Lease was a lease or a contract embodying a pretended sale. Put another way, it is of course necessary for an oral or implied contract to have definite terms. But there is no dispute here over what the terms were - we can tell what they were by the parties' own course of performance. The dispute is only over *when* the terms were agreed to. And it is clear that they were agreed to by December 15, when the parties put onto paper their intent that the Jays would "sell" the land to Nesco, who would then "lease" is back to them. Whatever agreement existed, existed by that date. Everything after that date was performance of the contract, performance perfectly in line with the precise terms of the contract.

1999 Lease. The exercise of discretion in light of either rationale was proper.

## II

Having agreed with the lower courts that the operative date for the transaction was December 15, 1999, I must reach the question of which definition of "homestead" controlled on that date. We review the lowers courts' ruling on this legal question *de novo*.[6]

The Texas constitution protects homesteads from "forced sales...for the payment of debts."[7] Prior to 1999, the constitution defined "homestead" to include a home *or* place of business; the latter is called a "business homestead."[8] In November 1999, an amendment to the constitution redefined a business homestead as property that is both a home *and* place of business.[9] The Texas legislature enacted a statutory provision reflecting this change on January 1, 2000,[10] leaving alone the nearby statutory section stating that the statutory definition applied to all homesteads "whenever created."[11] Here, both parties agree on appeal that if the new definition applies, the Jays cannot recover because they never lived on either of the two tracts. The Jays, of course, argued that the old definition should apply, and the lower courts agreed.

The lower courts found that the amendment was "self-effectuating" when passed in November 1999, meaning that no legislative or other action was needed to change the definition of "homestead."

[6]*Morante v. Am. Gen. Fin. Ctr.*, 157 F.3d 1006, 1009 (5th Cir. 1998).

[7]TEX. CONST. art. XVI, § 50(a), (c) (2005).

[8]TEX. CONST. art. XVI, § 51 (1999).

[9]TEX. CONST. art. XVI, § 51 (c) (2005).

[10]The act making the change was passed on May 28, 1999, but it provided that it was to "take effect January 1, 2000, but only if the constitutional amendment...is approved by the voters."

[11]TEX. PROP. CODE ANN. § 41.002(a),(d) (Vernon 2002).

They also found that the constitution's new definition of "homestead" prevailed over the old, contrary statutory definition, which was not updated to reflect the constitutional change until January 1, 2000. "The result is that, as of December 15, 1999, the change in Texas law was complete - an urban homestead could not be [created] without the maintenance of a home thereon."[12]

However, the courts also found that the amendment applied prospectively by default, meaning that property which previously had attained the status of homestead retained that status absent a constitutional or statutory provision stating that the constitutional amendment applied retroactively. Because there was no such constitutional or statutory provision providing for retroactivity of the new definition on December 15, 1999,[13] the Jays' property was protected on that date.

It was not until January 1, 2000, when the statutory provision updating the definition was enacted, that the amendment became retroactive and the Jays' .85 acre tract lost its status as a homestead. The courts then held that the tract lost its status as a homestead only with respect to transactions entered into after January 1, 2000, because any retroactive application for transactions occurring before January 1, 2000 would alter the substantive rights and obligations of the parties in violation of the Texas constitution's prohibition against *ex post facto* or retroactive laws.

In short, the lower courts held that the amendment was silent regarding retroactivity when passed and became retroactive by virtue of the January 1, 2000 statute, retroactive only for transactions entered into after January 1, 2000. In other words, the "retroactivity" enacted by the

---

[12]The Jays do not challenge this conclusion on appeal.

[13]As noted above, both on December 15, 1999 and January 1, 2000, TEX. PROP. CODE ANN. § 41.002(d) had the same language applying the statutory definition in § 41.002(a) to homesteads "whenever created." That is, the January 1, 2000 statutory amendment did not alter the retroactivity section of the statute. But on December 15, 1999, the statutory definition was the old definition.

statute removed the homestead shield from property like the Jays' in Texas, property which had gained that shield in the past, but not for past transactions.

I agree with the bankruptcy court that amendments to the homestead provision of the Texas constitution are not retroactive when silent about the retroactive reach. The Texas Supreme Court has so held.[14] Other federal and state courts, in holding that the amendment itself[15] or a statute[16] can overcome the default and provide retroactivity, concur. As the bankruptcy court held, "some positive action, either by constitutional or legislative provision, is required to divest property of its homestead character...." Consequently, we also agree with the bankruptcy court's conclusion that the January 1, 2000 statute validly made the amendment retroactive.

I also agree with the bankruptcy court that, as a result of

---

[14]*See Linch v. Broad*, 70 Tex. 92, 93-95 (1888) ("The provision of the present constitution enlarging the homestead exemption cannot be given retroactive application...so as to embrace in 1877 all property which in 1859 did not exceed in value the enlarge exemption prescribed by the constitution of 1876, without regard to value in 1877."); *Wright v. Straub*, 64 Tex. 64, 66 (1885); *McLane v. Paschal*, 60 Tex 102, 106-07 (1884).

[15]*See Dallas Power & Light Co. v. Loomis*, 672 S.W. 2d 309, 310 (Tex. App.-Dallas, writ ref'd n.r.e.).

[16]*See In re Niland*, 825 F.2d 801, 807 n.2 (5th Cir. 1987) (suggesting that earlier amendments were not retroactive until TEX. PROP. CODE § 41.002(c), passed in 1984, applied changes in the definition of homestead to homesteads "whenever created"); *In re Starns*, 52 B.R. 405, 413 (Bankr. S.D. Tex. 1985) (holding that amendment receives retroactive application because TEX. PROP. CODE § 41.001(c) provides retroactivity); *In re Barnhart*, 47 B.R. 277, 282 (Bank. N.D. Tex. 1985) (recognizing distinction between cases before 1983 amendment to constitution and 1984 codification of TEX. PROP. CODE § 41.001(c), where there was no retroactivity, and cases after the amendment and codification of there, which specifically provided retroactivity).

-12-

the statute, the .85 acre tract "lost its character as a business homestead" only "with respect to transactions entered into after" January 1, 2000. It held that this was so because "[t]he laws existing at the time a contract is made become a part of the contract and govern the transaction,"[17] and because the new definition could not be applied to old transactions without violating the Texas Constitution's prohibition against retroactive laws.[18]

While agreeing with the bankruptcy court's conclusion, I do not decide whether providing statutory retroactivity[19] for transactions occurring before the change in definition would violate the prohibition on retroactive laws. Rather, I construe the statute to avoid that constitutional question. The statutory language - "[t]he definition of a homestead as provided in this section applies to all homesteads in this state whenever created" - does not answer the question of whether the new definition applies to transactions occurring before the statute was enacted, as distinguished from the redefinition of all homesteads whenever

[17]*Wessely Energy Corp. v. Jennings*, 736 S.W. 2d 624, 626 (Tex. 1987).

[18]*See, e.g., Harman v. Urban*, 946 S.W. 2d 546, 551 (Tex. App. - Corpus Christi 1997, no writ) ("The substantive rights and duties of a party pursuant to an agreement are those under the law as it existed at the time the agreement was made. A subsequent law that changes those rights and duties would violate the Texas Constitution's prohibition against ex post facto laws.").

[19]The defendants argue that a constitutional grant of retroactivity for the definition, as opposed to a statutory grant, is valid even if it "conflicts" with the constitutional prohibition on retroactive laws. Although this may be true, *cf. Dallas Power & Light Co.*, 672 S.W.2d at 311, we do not decide the issue because the grant of retroactivity here was statutory.

created from that date foreword.  I have found no case where the court applied that or similar retroactivity provisions to such transactions; all of the retroactivity cases involve application of the new wording to land that was designated a homestead before the change, either maintaining or removing its homestead status for *future* transactions.  Moreover, in one of those cases the court, after holding that the 1970 amendment "applies to all homesteads in this state, including homesteads acquired before the adoption of this amendment,"[20] held that "its framers and adopters [intended it to be] retroactive with respect to judgment liens attaching *after* its effective date."[21]

And this, to my eyes, was the likely intent of the legislature, to redefine which properties received homestead protection in the future, potentially stripping old homesteads of their protection.  I cannot assume that it intended to upset concluded transactions framed against settled laws.[22]  And we need

---

[20]*Id.* at 310 (quoting the Texas House Joint Resolution accompanying the proposed amendment).

[21]*Id.* (emphasis added).

[22]*Cf. Wright*, 64 Tex. at 66 ("Obviously it was not the intention of the convention, in extending the homestead exemption, to divest or interfere with previously existing rights.  But if it had been the intention of the convention [to do so], still it has been held by the supreme court of the United States that an existing judgment lien is such a vested right as is beyond the power [possibly because of the contracts clause of the federal constitution] of a constitutional convention to divest or destroy.")  In *Wright*, a creditor received a judgment lien on a house which later fell under the new definition of a homestead.  The court held that it was not the intent of the amendment to destroy a previously existing right - the lien on the house.  Here the Jays had a similar previously existing right - homestead protection making an alleged lien invalid.  What is good for the creditor seems good for

not decide whether the contrary construction would violate the Texas constitution to be cognizant of the specter of constitutional infirmity in reading this ambiguous statute.[23]  The construction urged by appellants would mean that contracts for liens on homesteads violative of the homestead provision when made, and thus void, could be revived years later by statutory change.  At a minimum this would engage the Texas constitution's prohibition on retroactive laws, a path to be avoided in statutory construction.[24]

For these reasons, I would hold that the old definition of "business homestead" applied to the December 15, 1999 transaction.  The parties agree that the .85 acre tract satisfies that definition.

III

Because the .85 acre tract was a homestead, "[a]ll pretended sales of the homestead involving any condition of defeasance [are] void."[25]  The "question of whether an instrument written as a deed is actually a deed or is in fact a mortgage" is a question of

---

the debtor.

[23]*United States v. Marek*, 238 F.3d 310, 322 (5th Cir. 2001).

[24]As discussed by the court in *Wright*, *see supra* note 18, it may also violate the federal constitution.

[25]TEX. CONST. art. XVI, § 50(a), (c) (2005).

fact,[26] reviewed for clear error.[27]  I would affirm the lower courts'
conclusion that the deed was a disguised mortgage.

Under the Texas constitution, an option to repurchase, such as
the one held by the Jays, is a sufficient "condition of defeasance"
to void a pretended sale.[28]  Whether a sale was "pretended" is
determined primarily by the intent of the parties.[29]  The lower
courts made several observations in concluding that the parties
intended to disguise a mortgage.  First, Mr. Jay originally sought
a loan, and later he rejected two offers for "sale" which did not
include options to repurchase.  Moreover, Nesco was not in the
business of owning and leasing real estate, but rather was a
finance company with its own constructions crews.

More importantly, the courts noted that the Jays conveyed both
the .85 and 1.04 acre tracts,[30] worth a total of $306,000, of which
approximately $240,000 was equity after Nesco paid off $60,000 in
alleged liens.  Nesco never paid the Jays this $240,000.  The

---

[26]*Johnson v. Cherry*, 726 S.W.2d 4, 6 (Tex. 1987).

[27]FED. R. BANK. P. 8013.

[28] *Mosher Steel & Mach. Co. v. Nash*, 6 S.W.2d 158, 162 (Tex. Civ. App. - Dallas 1928, writ dism'd w.o.j.).

[29]*Johnson*, 726 S.W.2d at 6.

[30]The court also found it odd that Nesco would buy the 1.04 acre tract but build only on the .85 acre tract and that the Jays would lease back the 1.04 acre tract and do nothing with it, as they had for years.  Both acts make sense, of course, if the 1.04 acre tract was never sold but was merely additional security for a loan.

-16-

evidence revealed that Nesco considered this money part of the funds it was advancing to the Jays and which the Jays would have to pay back in the "lease" payments.  Thus, the equity could never have been paid because whatever money the Jays might have received they would have had to pay back.

The courts further noted that, while Nesco never explained to them its failure to pay the $240,000, the failure was made plain by its August 14, 2000 letter to the Jays, demanding increased lease payments before it would pay the Jays the $240,000.  The original amortization schedule attached to the lease listed the principal balance owing as $1,267,898.76.  Unforeseen increased construction costs may have eaten up all of this money, leaving nothing with which to pay the $240,000.  As a result, Nesco may have demanded increased lease payments to cover the additional construction costs.  Whatever the case, I agree with the lower courts that if Nesco agreed to pay $240,000 in purchase money for the properties, it should have paid that amount.  That it did not, and that it conditioned paying such amount on an increase in monthly rent payments, is compelling evidence that the $240,000 was not purchase money but part of a loan secured by the properties.  Much about the original intent of contracting parties is found in their subsequent performance of the contract.

The bankruptcy court also observed that part of the $1,267,898.76 balancing owing listed on the Lease represented $150,000 in working capital provided to the Jays, although only

$50,000 of that was paid.  No one can explain why this money was anything but a loan, unconnected in any way to the value of the property, for which the property was security.

In sum, that the whole transaction was a loan is clear: "loan" appeared everywhere on the Lease, with the Lease payments based not on rental value but on an amortization of the "loan amount" with payments reducing the "balance" due.  In addition, the Jays would have had to pay a set fee to exercise the option to "repurchase" the property.  The fee had no relation to the property's market value, decreasing after time to $64,050 plus the balance owing for the so-called lease payment.  Thus, after paying off the loan, the Jays could have "repurchased" their property for the fire-sale price of $64,050.

This is overwhelming evidence that this was a mortgage transparently cast as a sale.  The lower courts were not clearly erroneous in so concluding.

Nesco, quoting a case from this court, argues that

[t]he mere fact that the [land] may have been transferred...solely in order to avoid the prohibition against encumbering the homestead does not alone convert a legitimate sale into a 'pretended sale' or sham transaction.  Rather, a sale is 'pretended' if the parties to the sale did not intend for title to vest in the purchaser.[31]

It emphasizes that the only person to testify at trial to the intent to vest title was Mr. Jay, who stated that "[t]hey were to

---

[31]*In re Perry*, 345 F.3d 303, 312 (5th Cir. 2003).

build me a convenience store of my specifications, they were to furnish me with inventory and working capital, pay me for the equity of my land, and I had an option to repurchase." The lower courts were not clearly erroneous in concluding that this testimony, when viewed in light of the evidence described above, especially Mr. Jay's testimony that he rejected other financing offers because they did not include an option to repurchase, was insufficient to find that Mr. Jay had the intent to vest title in Nesco.

I also agree with the lower courts' rejection of Nesco's argument that, because it could have placed a lien on the .85 acre tract for purposes of improving it,[32] its lack of motive to circumvent the homestead provision proves it had no intent to do so. Nesco conceded that it could not have placed a lien over the $150,000 in working capital. Its arguments that that aspect of the transaction was "plainly secondary" and that it would not have risked a potential $1 million proper lien for improvements to get an additional $150,000 improper lien for inventory are not compelling.

I would hold that the lower courts did not clearly err in deeming the "lease" a disguised mortgage and in invalidating that mortgage.

IV

---

[32]TEX. CONST. art. XVI, § 50(a)(5) (2005).

-19-

Having found the underlying transaction to be a "pretended sale" prohibited by the Texas constitution, I must also reach the question of whether the lien held by Linc, transferred from Nesco to Bank One to Linc, was valid because Bank One was an innocent lienholder for value without notice.[33] Because the ruling here turns on a question of law, review is *de novo*,[34] and I would reverse the lower courts, which found that Linc's lien was void because Bank One had constructive notice of the underlying transaction.

When a transfer of property is found to have been a pretended sale prohibited by the Texas constitution, the deed is void and the pretended buyer holds an unsecured debt for the amount loaned to the pretended seller.[35] However, a subsequent purchaser or lienholder can prevail against a homestead claimaint if the subsequent purchaser or lienholder was an innocent purchaser for value without notice of the facts giving rise to the homestead claim.[36] To be classified as an innocent purchaser or lienholder,

---

[33]Nesco gave to Bank One a lien on the .85 acre tract as additional security for a previously issued note. Bank One later sold that note to Linc. Because Linc "stands in the shoes of his assignor," *Houk v. Commissioner*, 173 F.2d 821, 825 (5th Cir. 1949), the issue is whether Bank One - not Linc - was an innocent purchaser for value without notice.

[34]*Witty v. Delta Air Lines, Inc.*, 366 F.3d 380, 382 (5th Cir. 2004).

[35]*Johnson*, 726 S.W.2d at 7-8.

[36]*Eylar v. Eylar*, 60 Tex. 315, 316 (1883); *Red River Nat'l Bank v. Latimer*, 110 S.W.2d 232, 237 (Tex. Civ. App. - Texarkana 1937, no writ).

the party must have acted in good faith.

It is undisputed that Bank One paid value for the lien, acted in good faith, and had no actual knowledge of any potential claim by the Jays. The lower courts found that it had constructive notice of a potential homestead claim by the Jays. Interpreting *In re Rubarts*,[37] which ostensibly reconciled *Eylar v. Eylar*[38] with *Moore v. Chamberlain*,[39] the lower courts concluded that "a homestead claimant's possession of property imposes upon the third-party purchaser or lender a duty of inquiry that is not automatically discharged by merely checking the record title." Because the Jays were in possession of the tracts and Bank One made no investigation beyond a record check, the lower courts held that it should be charged with constructive knowledge. Because the question of whether a record check is insufficient to discharge a lender's duty of inquiry where the homestead claimant is in possession is a pure question of law, we review *de novo*.[40]

While the lower courts' interpretation of *Rubarts* was not unreasonable, I think it equally plausible to read that case to the contrary, as requiring no more than a record check where the homestead claimant is in possession and where there is no other

---

[37]896 F.2d 107 (5th Cir. 1990).

[38]60 Tex. 315 (1883).

[39]109 Tex. 64 (1917).

[40]*In re Mercer*, 246 F.3d 391, 402 (5th Cir. 2001).

-21-

reason to suspect a homestead claim.  Any further inquiry by Bank One past the record check here probably would have been futile. In December 2000, the Jays verified the lease in response to a letter from Nesco's auditors seeking verification.  If Bank One had asked the Jays about the lease, nothing suggests that the Jays would have offered a different response.  Asking an innocent lender like Bank One to shoulder the burden of figuring out whether the Jays had a homestead claim - a task which it would have taken this court more than fifteen pages to perform - is commercially unreasonable and I do not read Texas law to do so.